No. 82-283

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

---

ROBERT L. ADAMS,

        Plaintiff and Respondent,

  -vs-

LYLE H. CHENEY and SARA CHENEY,
husband and wife,

        Defendants and Appellants.

------------------------------

LYLE H. CHENEY and SARA CHENEY, husband and wife,

        Cross-plaintiffs and Appellants,

    -vs-

ROBERT L. ADAMS, TONY WASTCOAT, DON PFUTZENREUTER,
JAMES W. MAAS and MARILYN L. MAAS, husband and wife,

        Cross-Defendants and Respondents.

---

Appeal from:  District Court of the Eighteenth Judicial District,
In and for the County of Gallatin, The Honorable
W. W. Lessley, Judge presiding.

Counsel of Record:

    For Appellants:

        Bolinger & Conover, Bozeman, Montana

    For Respondents:

        Morrow, Sedivy, Olson & Eck, Bozeman, Montana
        Landoe, Brown Law Firm, Bozeman, Montana

---

        Submitted on Briefs:  December 30, 1982

                Decided:  March 24, 1983

Filed:   MAR 24 1983

            _Ethel M. Harrison_
---
                 Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Lyle and Sara Cheney wanted to sell their 230+ acre ranch located near Belgrade, Montana. They contracted with Robert Adams, a realtor associated with Action Realty of Bozeman, to sell the property. The terms of the agreement included:

> ". . . You may, if desired, secure the cooperation of any other broker, or group of brokers, in procuring a sale of said property. In the event that you, or any other brokers cooperating with you, <u>shall find a buyer ready and willing to enter into a deal for said price and terms, or such other terms and price as I may accept</u>. . . I hereby agree to pay you in cash for your services a commission equal in amount to 5% of the above stated selling price." (Emphasis added.)

Adams listed the property in the Multiple Listing Service.

Dr. James Maas was interested in buying ranch property in the Gallatin Valley. He was informed of the Cheney property by his agents, Don Pfutzenreuter and Tony Wastcoat of Waite Realty.

Maas visited the property a number of times. His chief concern during these visits was whether the east boundary of the property bordered the county road. He was assured that it did. On September 27, 1979, Dr. and Mrs. Maas and Mr. and Mrs. Cheney signed an "Earnest Money Receipt and Agreement to Sell and Purchase" which acknowledged that $3,500 earnest money had been paid to Cheneys by the Maases in part payment for the property. The September agreement provided in paragraph three:

> "If the Seller does not approve this sale within <u>0</u> days hereafter, or if seller's title is not merchantable or insurable and cannot be made so within a reasonable time after written notice containing statement of defects is delivered to

-2-

seller, then said earnest money herein receipted for shall be returned to the purchaser on demand and all rights of purchaser terminated unless purchaser waives said defects and elects to purchase."

The Cheneys wanted to buy property in Arizona and thereon retire. Their accountant advised them that they could effect a large tax savings if they exchanged real property with Maas. Thus, the parties included the following provision in the contract on a continuation sheet:

"It is further agreed by sellers and purchasers that in the event the seller can find suitable property and make arrangements for such property to close by Jan. 15, 1980, that the buyer will purchase such property to effect a tax free exchange with the seller on the said 230+/- acres. If seller is unable to secure such property to effect a tax free exchange by Jan. 15, 1980, the sale will be closed on contract for deed as stated above."

After locating property in Arizona, an offer was prepared which the Maases were to sign and forward to the owner of the property, Fran Nielsen.

While Cheneys were in Arizona, Maas employed a surveyor to survey the Cheney property. He found that the Cheneys were not the record owners of the eastern strip of land that bordered the county road. Maas relayed the problem to Pfutzenreuter, who then contacted Adams and on or about November 5, Adams contacted Cheney in Arizona. Cheney was completely surprised by the boundary problem as his family had been ranching on the property since 1903.

When Cheneys returned from Arizona they gave Maas, through the real estate brokers, the offer to sign and, with $500, send to Arizona. However, due to the boundary problem, Maas would not comply.

In an attempt to mollify Maas, realtors Pfutzenreuter and Wastcoat prepared the following addendum to the offer on the Arizona property:

> "This transaction is contingent on the approval of James Maas of the survey on the east boundary (bordering Thorpe Road) of 230+ acres located in section 31 and 32 of T1N R4E M.P.M., Gallatin County, Montana.
>
> "This offer is subject to and contingent on the terms of the earnest money receipt and agreement to sell and purchase dated September 27, 1979, between James W. Maas and Marilyn L. Maas, purchasers, and Lyle H. Cheney and Sara F. Cheney, sellers."

This addendum was prepared without authorization from either principal. Upon advice of counsel, Maas still would not sign the offer.

On December 2, 1979, the owner of the Arizona property contracted with a third party to sell the property. Closing occurred sometime in January.

Cheneys still wanted to sell the ranch. Even though they assert that the strip of land in question was under their ownership by adverse possession, the Cheneys purchased the strip from the adjacent landowner for $1,000. This piece of property was included in the subsequent sale to the Maases but Cheneys added $3,500 to the original price.

On February 12, 1980, a contract for deed was signed by both parties. No mention was made of the "tax free exchange."

The Cheneys did not pay the real estate commission. Consequently, Adams brought the primary action to recover his commission. Cheneys counterclaimed against Adams for breach of duties as a broker and fiduciary duties to Cheneys for failing to represent them in their dealings with Maases.

Cheneys cross-claimed against the other realtors for the same breach. They assert that they do not owe any real estate commission and, moreover, that Adams is owing to them the $3,500 earnest money. Cheneys also cross-claimed against Maases. They alleged that, by not submitting an offer for the Arizona property selected by Cheneys, the Maases breached the September 27 agreement. Specifically, they violated the clause on the continuation sheet of the contract regarding the purchase of property selected by the Cheneys. Cheneys alleged that their damage from such breach is the expense in finding the Arizona property, the loss of the tax savings and the loss of the Arizona property.

Adams contends that his duty to the Cheneys was performed when he procured a buyer that was ready, willing and able to purchase the property. Thus, he earned his commission.

The Maases contend that they were justified in not complying with the express conditions of the September contract regarding the purchase of the Arizona property. They argue that compliance was not required since the Cheneys did not have merchantable title, i.e., they were not record owners of the eastern strip bordering the county road.

Cheneys respond to Maases' contention by stressing that according to paragraph three of the September 27 agreement, they had a reasonable time period to make the title merchantable. They, in fact, did so by purchasing the questionable strip from the record owners.

The jury found for Adams and held that he recover his commission, costs and attorney fees. Furthermore, the jury

dismissed all claims asserted by the Cheneys.

The Cheneys appeal the jury verdict and present six issues for our determination:

1. Did the District Court abuse its discretion by refusing to give appellants' proposed instruction no. 25 regarding the issue of whether Maases breached their contract with appellants and in failing to give any instructions with respect to this breach?

2. Did the District Court abuse its discretion by refusing to allow into evidence certain exhibits and refusing appellants' proposed instructions, all regarding whether title for the subject property could be made merchantable within a reasonable period of time?

3. Did the District Court abuse its discretion in giving instruction no. 5 which stated that a real estate broker is only responsible for bringing the parties together?

4. Did the District Court abuse its discretion by refusing to give the jury appellants' proposed instruction nos. 8, 10, 11, 12, 13, and 14 regarding specific duties owed by the realtors to the appellants and the breach of such duties?

5. Did the District Court abuse its discretion by receiving into evidence an unsigned deposition?

6. Did the District Court abuse its discretion by giving the respondents eight peremptory challenges during the selection of the jury and allowing appellants only four challenges?

Appellants first contend the District Court abused its discretion by not giving any instructions on the Maases'

alleged breach of the September agreement. Specifically, appellants assert that it was an abuse of discretion for the District Court to refuse proposed instruction no. 25. This instruction states:

> "You are instructed that if you find that the Maases refused to sign the contract for the Arizona property secured by the Cheneys and submitted to the Maases for signature and refused to send $500.00 in earnest money to hold the Arizona property, then you must conclude that the Maases breached the provisions of their September 27, 1979, contract with the Cheneys."

According to the tax free clause in the September agreement, the Maases were to make an offer on property selected by the Cheneys. Maases would then exchange such property for the Cheneys' property to effect an alleged tax savings. However, paragraph three of the contract relieved the Maases of their obligations if the sellers' title is not merchantable and cannot be made so within a reasonable period of time after written notice of such defects is delivered to the seller. This, in essence, is the buyers' escape clause, protecting them from incurring an obligation to purchase property with a defective title.

Upon discovery of the possibility that Cheneys' title did not include the strip of land bordering the county road, land-locking the Cheney property, Maases were reluctant to make the offer on the Arizona property. In the meantime, the Arizona property was sold to a third party and the Cheneys cross-claimed against Maases for breach of the September agreement. They claim that Maases' failure to make the offer on the Arizona property constituted a breach of the September agreement and the jury should have been instructed on such breach.

We believe the District Court did not abuse its discretion by refusing appellants' proposed instruction no. 25. This particular instruction is not only misleading, but it is an incorrect statement of the law. The instruction requires the jury to find a breach if they determine that Maases did not offer to buy the Arizona property. It makes no provision for the escape clause that allows the Maases to avoid making the offer if title is unmerchantable and cannot be made so within a reasonable period of time.

Moreover, we hold the court was correct in not instructing the jury on the breach of the September agreement. The tax free clause outlined on the continuation sheet placed an unreasonable burden on the Maases. When the seller selects property, the buyer must make an offer on such property or he has breached the contract. He can avoid making the offer if, in accordance with the escape clause, he can immediately ascertain that title to the sellers' property is unmerchantable and cannot be corrected within a reasonable period of time. This determination is speculative and the buyer should not be dealt such a burden. The buyer may be forced to exchange for unmerchantable property or, in the worst situation, wind up with property that the seller has selected for himself. In the typical situation, without the tax free clause, if the buyer finds title to be unmerchantable and cannot be made so within a reasonable period of time, the contract can be rescinded and any payments will be returned to him.

As in this case, the tax free clause forces the buyer to accept doubtful title. This Court has held that buyers of real estate should not be required to do so. Silfvast v.

Asplund (1933), 93 Mont. 584, 20 P.2d 631; Bozdech v. Montana Ranches Co. (1923), 67 Mont. 366, 216 P. 319. Thus, we hold that, in the present context, the tax free clause was invalid and the buyer was justified in not offering to buy the Arizona property. Hence, no breach occurred and the instruction regarding such breach was properly refused.

We are not rejecting the use of real property exchange clauses in real estate contracts. They can be valuable tools to effectuate the parties' ojectives. However, parties should be careful in using them and specifically place a condition in such a contract that requires merchantability to be proven before the buyer must obligate himself to purchase exchange property.

Secondly, appellants contend the District Court abused its discretion be refusing to allow into evidence documents establishing merchantability and that appellants' title could have been made merchantable within a reasonable period of time. Also, appellants assert they were prevented from being heard on whether such evidence should be admitted. We note that this offer of proof was made to show that Maases violated the tax free clause, not to establish that Maases did not purchase the Cheney ranch because of title problems. On the contrary, the Maases did eventually purchase the Cheney property and the Cheneys purchased land in Arizona. Consequently, since we have determined the tax free clause to be invalid and that Maases did not breach the agreement, we hold that the District Court made correct rulings on these evidentiary questions. Evidence of merchantability, in the context presented by the appellants, was irrelevant to the issues of the action. Further, the court was correct

in declining to admit the evidence in question in order to prevent the suit from becoming a quiet title action.

Appellants also contend a further abuse of discretion by the District Court in refusing their proposed instructions on whether title could be made merchantable within a reasonable period of time. Here again, appellants were proposing their instructions so the jury would find that title could have been made merchantable within a reasonable period of time, obligating Maases to purchase the Arizona property. Their failure to do so would have constituted the breach. However, since we have held the tax free clause to be invalid, Maases were not obligated to purchase the Arizona property. Thus, the proposed instructions on the question of merchantability were irrelevant.

Third, appellants assert the District Court abused its discretion by instructing the jury that a real estate broker is only responsible for bringing the parties together. This was outlined in instruction no. 5:

> "A real estate broker earns his commission when he procures a buyer who is ready, willing and able to purchase real property on such terms as the sellers may agree. The ultimate sale terms need not be what the broker's contract contains. A broker is not required to do everything to complete the sale, but is only responsible for bringing the parties together."

The law is clear in Montana. In Barrett v. Ballard (1980), _____ Mont. _____, 622 P.2d 180, 37 St.Rep. 2038, we said:

> "The law in this state is well settled. The broker need not do everything to complete the sale but only be responsible for bringing the parties together. In Shober v. Dean (1909), 39 Mont. 255, 102 P. 323, this Court set the standard which should judge broker causation:

"'. . . It appears to us that there can be but one answer: It was intended that, if the efforts of Shober set in motion a chain of events which finally culminated in a sale of the property, then he should recover the maximum fee; . . .'" 622 P.2d at 186. (Emphasis added.)

Hence, absent contrary terms in the brokerage contract, when a broker brings a seller together with a buyer who is ready, willing and able to purchase and a sale takes place at terms satisfactory to the seller, the broker has earned his commission.

There were no terms in the contract that would obligate the broker to complete the sale. Thus, instruction no. 5 was a correct statement of the law, and there was no abuse of discretion in giving it to the jury.

Fourth, appellants argue that the District Court abused its discretion by refusing their instructions regarding duties owed by the realtors to the appellants and the breach of such duties. Appellants assert that three specific duties arose based on the facts of the case. The alleged duties are:

(1) The duty to convey to the Maases the fact that the Cheneys could easily correct any defect in merchantability of title as to the strip of land fronting on the county road;

(2) The duty to bring the Cheneys and the Maases together so that the Maases would have no fears as to the merchantability of title rather than keeping the two parties separated; and,

(3) The duty not to change the terms and conditions of Real Estate Purchase Contract and Receipt for Deposit regarding the Arizona property without the express approval

-11-

of their principals, the Cheneys.

Appellants translated these duties into proposed instruction nos. 8, 10, 11, 12, 13, and 14. We believe the court properly refused these instructions.

As previously discussed, a realtor's primary duty is to bring parties together, unless otherwise stated in the listing agreement. Furthermore, in accomplishing this a realtor has a *fiduciary duty* to his client. Carroll (Cornwell) v. Watson (1978), 176 Mont. 344, 578 P.2d 308. Fiduciary duties encompass full disclosure, First Trust v. McKenna (1980), ____ Mont. ____, 614 P.2d 1027, 37 St.Rep. 1026; Lyle v. Moore (1979), 183 Mont. 274, 599 P.2d 336; good faith, Frisell v. Newman (1967), 71 Wash.2d 520, 429 P.2d 864; and acting in the client's best interests.

Once a broker involves himself with the completion of a transaction, he must continue to act in accordance with the above fiduciary duties. In the present situation it appears that all the realtors assumed a role in the completion of the transactions. The jury was instructed on the fiduciary duties owed to the parties by the realtors when they assumed this role. These duties are embodied in instruction nos. 7, 8, 9 and 10. The jury determined that these duties were not breached.

The District Court was correct in refusing appellants' proposed instructions based on the three alleged duties outlined above because there was no factual basis for such instructions. This Court has held that it is not error to refuse instructions not supported by the evidence. Penn v. Burlington Northern, Inc. (1980), ____ Mont. ____, 605 P.2d 600, 37 St.Rep. 93; Porter v. Crum-McKinnon Building Co.

(1963), 142 Mont. 74, 381 P.2d 794. The specific duties expressed by the appellants either did not exist or were not breached.

The brokers had no duty to convey to Maases that title defects could be corrected immediately. This would force the realtors to make a difficult legal determination which they are not required to do.

Secondly, the realtors did not breach the duty to bring the parties together to alleviate the title problem. Each party was contacted immediately through their agents. Further, the agents were acting in the best interests of all parties as they were actively trying to solve the title problem.

Thirdly, we believe the duty not to change the Arizona offer without Cheneys' approval is illusory. Initially, we note that Adams was not involved in the preparation of the addendum. Pfutzenreuter and Wastcoat were the persons involved. However, if such a duty existed, the breach thereof is immaterial and did not prejudice Cheneys because it was ineffectual; Maases would still not sign the offer.

Fifth, the appellants assert the District Court abused its discretion by receiving into evidence an unsigned deposition. The basis of the appellants' objection is that they had not waived the lack of signature in accordance with Rule 30(e), M.R.Civ.P.

On April 23, 1982, the deposition of Fran Nielsen, the owner of the Arizona property, was taken in Arizona. At the deposition, both Cheneys and Maases were represented by counsel.

At the deposition, Nielsen was asked if she wanted to

review the deposition when completed and then sign it. She indicated that she did. However, on the signature line at tne end of the deposition, the words "signature waived" are typed. Nothing in the deposition indicated the circumstances of the waiver.

In the morning of the day the deposition was to be introduced, counsel received copies of the deposition. After the reading of the deposition was underway, counsel for Cheneys objected to it as it was unsigned. He presented no evidence of prejudice due to this procedural irregularity.

We reject appellants' contention because no motion to suppress the deposition was made at the outset. Rule 32(d)(4), M.R.Civ.P., prescribes that any irregularities of the form of the deposition are waived unless a motion to suppress the deposition is made with reasonable promptness after such defect is, or with due diligence might have been, ascertained.

In this situation appellants did not object to the irregularity until after the reading of the deposition into evidence had commenced. Counsel for appellants had received the deposition in the morning prior to trial; thus, the irregularity should have been discovered then and a motion to suppress made accordingly. Furthermore, since no evidence regarding the waived signature was presented, we cannot ascertain a basis from which to conclude appellants were prejudiced by the irregularity in the deposition.

Sixth, the appellants contend the District Court abused its discretion by giving the Maases four peremptory challenges, the realtors as a group four peremptory challenges, and four peremptory challenges to appellants.

-14-

Essentially, appellants urge the court to view the Maases and the realtors as one group and consequently allocate them only four peremptory challenges.

Section 25-7-224, MCA, entitles each party to four challenges. Lauman v. Lee (1981), ____ Mont. ____, 626 P.2d 830, 38 St.Rep. 499, approves the granting of separate peremptory challenges to codefendants who occupy hostile positions. The appellants assert that the Maases and the realtors do not occupy hostile positions. On the contrary, the Maases and two of the realtors are represented by identical counsel.

In reviewing the lower court's granting of additional peremptory challenges, we have held that the complaining party must show he was prejudiced by such action. Leary v. Kelly Pipe Co. (1976), 169 Mont. 511, 549 P.2d 813; Ashley v. Safeway Stores, Inc., et al. (1935), 100 Mont. 312, 47 P.2d 53. In Leary we determined that to establish reversible error, the complaining party must show: (1) that he exhausted his peremptory challenges; (2) that he has suffered material injury from the action of the court; and (3) that as a result thereof one or more objectionable jurors sat on the case. 169 Mont. at 516, 549 P.2d at 816.

These requisite findings were taken from an annotation on the effects of allowing excessive peremptory challenges. Annot., 95 ALR2d 957, 963 (1964). It states, "[t]he numerical weight of authority in civil cases supports a rule that a judgment will not be reversed for error in allowing one or more peremptory challenges in excess of that provided by statute, unless the complaining party shows that he has. . . suffered material injury from the action of the court."

Numerous cases from fifteen jurisdictions were cited supporting this rule.

The Washington Supreme Court has also articulated that prejudice must be shown to cause reversal. In State v. Evans (1980), 26 Wash.App. 251, 612 P.2d 442, the court held that parties are not entitled to have any particular juror serve. Unless prejudice results from allowing an excessive number of peremptory challenges, reversible error has not been committed. See also, Creech v. City of Aberdeen (1906), 44 Wash. 72, 87 P. 44; Trautman, Serving Substantial Justice --A Dilemma, 40 Wash. L. Rev. 270, 278 (1965).

The underlying rationale of voir dire, and specifically peremptory challenges, is to insure that litigants receive a fair and impartial jury. It is not to provide parties with jurors who are favorable to their position, even though this is often the objective and result. Consequently, if the court's action allowing additional challenges does not prejudice the complaining party, he has received a fair and impartial jury. In essence, the end has been accomplished and an irregularity in the means should not cause reversal.

On the other hand, in Hunsaker v. Bozeman Deaconess Foundation (1978), 179 Mont. 305, 588 P.2d 493, this Court recognized that proving prejudice may be practically impossible. We held in Hunsaker that the correctness of the trial court's decision regarding peremptory challenges, when it was actually made, should be part of the review process on appeal. However, this would require an adequate record of the lower court's decision. Thus, the following suggestion was made:

"The District Courts should seriously consider the use of the pretrial conference as the best procedure to be used in resolving questions such as the number of peremptory challenges to be allowed each side. If for some rare reason the District Court holds no pretrial conference, the question of peremptory challenges should be raised by appropriate written motion filed before the commencement of jury selection, and it should set forth all facts and references tending to support his claim of hostility. In any case, the opposing party or parties should be given adequate time to respond to the claims of hostility.

"The trial court should, as a bare minimum, rule on the peremptory challenge issue before the questioning of jurors begins. To afford a basis for review, it should expressly set forth in the record the reasons for its ruling and the facts on which it relies in making its decision." 179 Mont. at 318, 588 P.2d at 501.

If there is not a sufficient record by which the Court can review the District Court ruling, then the conduct of the jury must be examined in accordance with Leary.

In the case at bar, the pretrial conference did not determine the allocation of peremptory challenges. Furthermore, counsel dispensed with the recording of voir dire and the appellants objected to the allocation of the challenges after the questioning of the jurors was complete and while the challenges were being exercised.

The basis of the appellants' objection was that two of the realtors and the Maases were represented by the same law firm. The court overruled the objection and stated, "to say there is no adversity because of the fact that the firm represents two groups of people is not cogent as far as this Court is concerned."

Hunsaker indicates that as a bare minimum, to afford a basis for review, the trial court should expressly set forth

-17-

in the record the reasons for its ruling and the facts on which it relies in making its decision. The brief interchange between the court and appellants' counsel does not meet this minimum requirement. We do not have a sufficient record to determine the correctness of the District Court's ruling when it was actually made. Thus, as determined by Hunsaker, we must examine the conduct of the jury in light of the Leary decision.

Presently, the appellants have not convinced this Court that the realtors and the Maases were not entitled to separate peremptory challenges. Most importantly, the appellants have not shown any material injury suffered from the court's action or that any objectionable jurors sat on the case as a result of the court's action.

Finally, even though not raised by any of the parties, we note an apparent typographical error in the judgment. The jury verdict lists the damages at $9,229.25 but the judgment lists them at $9,299.25. The jury verdict as approved by the foreperson is controlling and damages are $9,229.25. The judgment is ordered amended accordingly.

Affirmed.

_____
Chief Justice

We concur:

_____

_____

_____

_____
Justices

-18-